FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

AO 91 (Rev. 11/11) Criminal Complaint

OCT 1 2 2016

MATTHEW J. DYKMAN
CLERK

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| JENNIFER MARISSA MIERA | ) | Case No. 16mj3767 |
| TROY MONTOYA | ) | |
| SHAWN MICHAEL GOODRUM, JR. | ) | |
| | ) | |
| | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **October 6, 2016** in the county of **Taos** in the
_____ District of **New Mexico**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. Section 2113 | Bank Robbery |
| Title 18 U.S.C. Section 371 | Conspiracy |
| Title 18 U.S.C. Section 4 | Misprision of Felony |

Probable cause found for Miera and Montoya under 18 USC § 2113(b) and 18 U.S.C. § 371.
Probable cause found for Goodrum under 18 USC § 2113(c) and 18 U.S.C. § 4.

This criminal complaint is based on these facts:
See attached affidavit.

☐ Continued on the attached sheet.

_____
Complainant's signature

Russell S. Romero, Special Agent, FBI
_____
Printed name and title

Sworn to before me and signed in my presence.

Date: **10/12/2016**

_____
Judge's signature

City and state: **Albuquerque, NM**

Hon. Steven C. Yarbrough, US Magistrate Judge
_____
Printed name and title

In the United States District Court

District of New Mexico

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| VS. | ) |
| | ) |
| JENNIFER MARISSA MIERA | ) |
| Year of Birth 1994 | ) |
| SSAN: XXX-XX-5931 | ) |
| | ) |
| TROY MONTOYA | ) |
| Year of Birth 1992 | ) |
| SSAN: XXX-XX-8347 | ) |
| | ) |
| SHAWN MICHAEL GOODRUM, JR. | ) |
| Year of Birth 1996 | ) |
| SSAN: XXX-XX-2110 | ) |

## AFFIDAVIT

I, the undersigned, being duly sworn, hereby depose and state as follows:

1. I, Russell Romero, am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so employed for over nine years. I am currently assigned to the Albuquerque Field Office to investigate violations of Federal law, Including Title 18, United States Code, Section 2113, Bank Robbery, Title 18 United States Code Section 371, Conspiracy, and Title 18, United States Code Section 4, Misprision of Felony. The information set forth in this affidavit has been derived from my own investigation or communicated to me by other sworn law enforcement officers.

1

2. On 10/06/2016, at approximately 9:00am, the People's Bank, located at 121 East Main Street, Red River, New Mexico, 87558, was robbed by an individual using intimidation and force. This individual provided the victim teller with a note stating that he had a gun in his waistline and that no harm would happen to anyone if the teller gave him all of the money in her drawer. The note also instructed the recipient to remain quiet or the robber would "pull it," referring to the gun. The Peoples Bank is a federally insured institution. A loss of $12,229.00 was sustained.

3. The aforementioned robbery was conducted by an Unknown Individual (UI) described as being a hispanic male in his 20's, wearing a blue/white/grey jacket over a dark hooded jacket or sweatshirt with the hood pulled over his head. The UI was also wearing latex-type gloves.

4. Shortly after 9:00am on Thursday, October 6, 2016, Jennifer Marissa Miera, Personal Banker at the People's Bank, Year of Birth (YOB) 1994, Social Security Account Number (SSAN) XXX-XX-5931, unlocked the front door to open the bank for business. After unlocking the door, an unknown individual described above, entered the building.

5. Miera stated that she told the UI that she could help him at her desk. He then proceeded to follow her without saying anything. When they arrived at her desk, they both sat down.

6. The UI then took a sandwich bag out of his jacket and placed it down on the desk. He then took a demand note out of the sandwich bag and placed it in front of Miera. Miera moved the note towards her, opened her drawer, and filled a "zebra print" makeup bag that the UI had given her with money from her top and bottom drawers.

7. The UI then fled the bank on foot, slamming the door open against the wall on his way out of the bank.

8. In total, the UI took $12,229.00. Included in the total was five $20 "bait bills" whose serial numbers were recorded. A.B., the bank manager, provided a photocopy of the "bait bills" showing their serial numbers.

9. I photographed the note and sandwich bag in place on Miera's desk. The note read: "I have a gun in my waistline dont make a sound or I will pull it give me all the money you have in your drawer and I will leave, and no harm will happen." I collected the note and the sandwich bag as evidence.

10. The note was written on a particular looking piece of paper and had the bottom of the page torn away.

11. I later reviewed the surveillance video from the bank robbery with Taos County Sheriff Jerry Hogrefe and Red River Town Marshall David Smith. In the video, it appeared that Miera, upon receipt of the note, did not take the time to read it before complying with the demands on the note.

12. In addition, Miera, during her interview, stated that the male suspect did not speak to make any verbal demands.

13. It was also noted that in the video, it is clear that Miera unlocked the door to the bank, and the UI, instead of going to one of the teller stations closer to the door that he entered, went to Miera's desk located toward the northeast corner of the bank.

14. After review of the video, Miera was located at the bank and asked to come to the Marshal's Office where she was re-interviewed by myself and Marshal Smith. Before the interview commenced, I informed Miera that she was free to leave at any time.

15. During the interview, Miera admitted to being involved in the robbery, but stated that she was coerced by two UI's who threatened both her and her family if she did not agree to

3

help them.

16. Miera stated that she only knew the UI's as "Carlos" and "Shady." She stated that she had never met them before, but that they had approached her while she sat in her vehicle after she locked the bank on Tuesday evening. Miera stated that they told her that they knew where she lived and that they needed her to do them a favor or they would kill her.

17. Miera also stated that the two UI's showed up at her residence the night before and told her that they were going to rob the bank. This time they threatened both her family and herself if she refused to help them.

18. Miera stated that she had nothing to do with the planning of the robbery and just thought that it might occur soon.

19. During the interview, Miera admitted to being a cocaine user but stated that she only used it occasionally. The last time that she used cocaine was several days ago.

20. Marissa also admitted to being on probation at the bank because her drawer recently came up $400 short.

21. Also during the interview, Miera stated that she had recently found out that she was pregnant, and stated, three times, that she intended to commit suicide. Because of this, she was medically evaluated and then transported by EMS to Holy Cross Hospital in Taos where she was kept for overnight for observation.

22. The following morning, due to Miera's changing story, and the fact that she had admitted that she knew that the robbery was going to occur, Marshal Smith and Sheriff Hogrefe became concerned that valuable evidence may be lost if Miera was released from the hospital and was allowed to return home with a chance to destroy or hide evidence of her involvement in the bank robbery.

23. Sheriff Hogrefe obtained a search warrant, signed by New Mexico Eighth Judicial District Court Judge Emilio Chavez, for Miera's residence, #125 El Rito Road, Questa, New Mexico, while Marshal Smith secured the residence.

24. While serving the warrant, Marshal Smith and Sheriff Hogrefe found a pad of paper that appeared to contain the same paper as that used for the demand note for the robbery. In addition, they located, in the trash, two pieces of paper that had appeared to have been torn from the bottom of a page in the notepad.

25. Marshal Smith and Sheriff Hogrefe compared a picture of the demand note to the torn pieces of paper. The pieces found appeared to be the bottom half of the demand note.

26. In addition, they located a pair of latex-style gloves that were wadded up next to a medical face mask inside a trash bag. Underneath the kitchen bar they located a box of sandwich bags that appeared to be the same as the bag that held the note. A small zebra print bag was also found at the residence. Two recently used tampons were located in the trash, casting doubt on whether Miera was pregnant.

27. Upon completion of the search, Miera agreed to speak with Marshal Smith and Sheriff Hogrefe, again changing her story.

28. Regarding the zebra print bag, Miera admitted that she gave the subjects the bag that was used in the robbery.

29. Regarding any identifying marks on the subjects, Miera initially told Marshal Smith and Sheriff Hogrefe that they had none, then stated that one of them had an "M" on his left shoulder, then later stated that the "M" was "Martinez."

30. Miera also told Marshal Smith and Sheriff Hogrefe that she told the two UI's how she thought the robbery should take place by using a letter and wearing gloves, later stating

5

that she only did so because she was scared.

31. Miera told Marshal Smith and Sheriff Hogrefe that her cousin, Troy Lonnie (later identified as Troy S. Montoya) had written the demand note, and stated that he had been at her house the night before the robbery when the final details were made by the two UI's that she claimed to have threatened her.

32. During the search, a note had been found that appeared to be of the same handwriting as the note passed at the robbery. The note found was one of encouragement over something coming up and was signed, "Troy."

33. Miera maintained that the two UI's had threatened to hurt her and her family and that is why she helped them rob the bank.

34. On Saturday, October 8, 2016, Miera contacted Marshal Smith by phone advising that she had more details to tell him. Marshal Smith, who was out of town at the time, arranged to meet with Miera on Monday.

35. Later, Marshal Smith spoke to Miera's father, A.M., who stated that he was furious with Miera. A.M. told Marshal Smith that Miera had been borrowing his pickup after she had told her parents that her car was in the shop being repaired. When he was looking in his pickup that afternoon, he found two more gloves, a medical mask, and a receipt for the purchase of these items. A.M. told Marshal Smith that the receipt showed that Miera had made the purchases herself.

36. A.M. also told Marshal Smith that he had found out that Miera's car was not in the shop, but in fact, had been repossessed.

37. On the morning of October 10, 2016, Miera voluntarily showed up at the Red River Marshal's Office and stated that she wanted to "tell the truth." Miera was read her Miranda Rights and she voluntarily signed a form acknowledging her understanding of

6

those rights.

38. Miera then confessed to Marshal Smith and Sheriff Holgrefe that her car had been repossessed on Friday, September 30, 2016. She stated that the following Monday, October 3, 2016, she drove to Espanola to a location that had held a party where she had first met the two UI's, and told Marshal Smith and Sheriff Holgrefe that their names were Mike "Shady" Macias and Anthony "Carlos" Martinez.

39. Miera informed Marshal Smith and Sheriff Holgrefe that she told Macias and Martinez that she was in trouble and asked if they could help her by robbing the bank. She stated that she told Macias and Martinez how to pull off the robbery by telling them what time they could do it, how to do it, and that she had provided them the gloves and the masks to do so.

40. Miera also stated that she and her cousin, Troy S. Montoya, went to Walmart on Wednesday, October 5, 2016, and purchased the gloves and masks. She told Montoya to hide the items after the meeting on the evening before the robbery and that he hid them in her father's pickup.

41. Miera informed Marshal Smith and Sheriff Hogrefe that as payment for her help to plan and assist the robbery, Macias and Martinez agreed to pay off her note at the Del Norte Credit Union so that she could get her car back.

42. Miera stated that Macias and Martinez told her the bank was to be robbed on the morning of October 6, 2016 when the bank opened.

43. Subsequent to the interview, Marshal Smith arrested Miera on state charges of Conspiracy to Commit Armed Robbery and Accessory to Armed Robbery.

44. Marshal Smith then obtained an arrest warrant for Troy S. Montoya, YOB 1992, SSAN XXX-XX-8347 from New Mexico Eighth Judicial District Court Judge Jeff McElroy.

7

Montoya was charged with Conspiracy to Commit Armed Robbery and Accessory to Armed Robbery.

45. At approximately 10:30pm that evening, Marshal Smith was informed by Sheriff Hogrefe that Montoya had been arrested at the McDonald's in Espanola, New Mexico, where he was employed. Sheriff Hogrefe informed Marshal Smith that he was enroute to Espanola to take custody of Montoya and was transporting him back to Taos for questioning and to be booked into jail.

46. At approximately 11:45pm that evening, Marshal Smith met Sheriff Hogrefe at the Taos County Sheriff's Office. Marshal Smith then read Montoya his Miranda rights and Montoya agreed to give a statement.

47. Montoya stated that Miera had asked him to help her rob the bank because she was in financial trouble. At first Montoya was unsure about helping Miera, but eventually agreed to help her plan and execute the robbery, and that he was with Miera when she bought the gloves and masks to be used in the robbery. He also stated that they (Montoya and Miera) went to Miera's residence the night before the robbery to make final preparations, and that they drank and did cocaine together while doing so.

48. Montoya also stated that on the morning of the robbery, he drove Miera to the bank in her father's pickup, and parked in the parking lot on the south side of the building that housed the bank. He waited until 9:00am when she had told him to arrive, and, after entering the bank, proceeded to follow her to her desk where the robbery took place. He then left, ran to the pickup, and headed back to Miera's residence by way of Questa.

49. Montoya stated that he was nervous and, somewhere along the route, took the outer jacket off and threw it out the window. When he arrived at Miera's residence, he put the bag of money under a large tree on the property.

50. Montoya stated that he felt "remorseful" and was glad to get the confession off of his chest.

51. Marshal Smith then asked Montoya who "Shady" was, and Montoya informed him that he (Montoya) was known as "Shady." Marshal Smith if either he or Miera were threatened by anyone and he replied, "No." Marshal Smith then asked Montoya if anyone else was involved in the robbery, and Montoya replied, "No."

52. Subsequent to the interview, Marshal Smith and Sheriff Hogrefe went back to the property at Miera's residence to try to locate the money, but were unsuccessful.

53. The following morning, on October 11, 2016, Sheriff Hogrefe confronted Miera with Montoya's confession to attempt to determine where the money was. Miera informed Sheriff Hogrefe that she had initially asked Mike Goodrum (identified as Shawn Michael Goodrum, Jr., YOB 1996, SSAN XXX-XX-2110) to help her with the robbery via text message. When Goodrum, Jr., did not respond to her, she decided to ask Montoya to help her rob the bank.

54. After the bank robbery, Goodrum, Jr., contacted Miera and informed her that he knew that she did the bank robbery and he had saved her messages. Goodrum, Jr., threatened to take the messages to the police unless she gave him a cut of the money.

55. Sheriff Hogrefe then obtained a search warrant for Goodrum's residence, 214 Casitas de Questa, Questa, NM, and his vehicles, which included a red Ford pickup truck.

56. Marshal Smith informed me of the warrant, and I and FBI Special Agent Samuel Hartman traveled to Questa, NM to assist with the execution of the warrant.

57. While Sheriff Hogrefe was obtaining the search warrant, Marshal Smith maintained surveillance on the residence. While Sheriff Hogrefe was enroute to Questa, Marshal Smith noticed the red Ford Pickup truck leaving the residence. The truck was then pulled

9

over by Questa PD for a traffic violation.

58. Marshal Smith approached the driver, Goodrum, Jr., and informed him that he wanted to speak with him about the recent bank robbery in Red River. He also informed Goodrum, Jr., that they had obtained a warrant for his residence and his vehicles. Goodrum, Jr. then told Marshal Smith that the money was in the back seat of his pickup truck.

59. While looking in the back seat of the truck, Marshal Smith noticed a zebra print bag in the passenger side back seat that matched the description of that used in the robbery.

60. Marshal Smith then informed me via telephone of what had just occurred and stated that he was going to wait until SA Hartman and I had arrived on scene before looking in the bag or questioning Goodrum, Jr. any further.

61. Upon our arrival, Marshal Smith showed us where the bag was located in the truck and informed us that he had not opened nor moved the bag.

62. We then proceeded to interview Goodrum, Jr., who, after being read his Miranda Rights, agreed to give us a statement. Goodrum, Jr., signed an Advice of Rights form indicating that he understood his rights.

63. During his interview, Goodrum, Jr. confirmed Miera's statement by saying that she had written him to rob the bank, and that he had blackmailed her into giving him a portion of the money.

64. Also during the interview, Goodrum, Jr. made reference to his phone several times. Marshal Smith then got Goodrum, Jr.'s phone from his truck to allow Goodrum, Jr. to show me messages exchanged between Goodrum, Jr. and Miera.

65. Goodrum, Jr., informed me that that phone did not work except with WiFi. He pulled up a string of Facebook Messenger messages between himself and Miera to show me.

66. The messages included one from Miera that read that Miera had to "move the candy" but promised Goodrum, Jr. and he would get his share.

67. In that same string of messages, Miera had sent Goodrum, Jr., a picture of a tree with a circle drawn on it showing where the money was.

68. In the same string of messages, Miera warned Goodrum, Jr., not to use the "candy" with the blue wrapper because the "candyman" knew that candy was "special."

69. Goodrum, Jr. also showed me a photograph of Miera and a male individual who Goodrum, Jr. believed to be Miera's cousin, that Miera had posted on Snapchat the night before the robbery.

70. Goodrum, Jr. informed writer that Miera had contacted him to do the robbery, and when he did not respond, told him that she had already found someone (her cousin) to do it.

71. After Goodrum, Jr. heard that the bank was robbed, he contacted Miera with screenshots of their previous conversation in an attempt to blackmail her into giving him some of the money.

72. Goodrum, Jr. initially stated that he only wanted $1000 as he wanted to move back to Arizona, but that Miera told him that he could take half of the money in the bag.

73. When Goodrum, Jr. got the money, he initially counted it and estimated that there was approximately $6,000.00 in the bag.

74. Goodrum, Jr. estimated that he spent several hundred dollars to fix his truck, buy food, gas, and marijuana, and had given $300.00 to B.V. to get to Colorado.

75. After the interview, SA Hartman and I collected the zebra print bag from the truck and opened it up. Inside there were several stacks of United States Currency. Upon counting it, we discovered that it contained $4983.00.

76. Included in the above total was a stack of five $20.00 bills wrapped in a blue strap. Upon comparison of the serial numbers of these bills to the serial numbers of the "bait bills," it was determined that these five bills were the bait money.

77. SA Hartman and I also seized $165 in US Currency from Goodrum, Jr.'s wallet, which was located above the visor in his truck, as well as Goodrum, Jr.'s cell phone.

78. Goodrum, Jr., was arrested, on probable cause, for a violation of Title 18 United States Code 4 – Misprision of Felony, as he had knowledge of the bank robbery and, rather than report it to Law Enforcement, used it to blackmail Miera.

79. SA Hartman and I then went to Goodrum, Jr's residence, where the search was still ongoing. While there, we were informed by deputies of the Taos County Sheriff's Office that they had found $1000 in an envelope in one of the rooms.

80. SA Hartman, Marshall Smith, and myself then travelled to the Taos County Detention Center where SA Hartman and I arrested, on Probable Cause, Miera and Montoya for their involvement in the bank robbery, a violation of Title 18, United States Code Section 2113.

81. A Taos County Sheriff's Deputy transported Goodrum, Jr. and Montoya, while SA Hartman and I transported Miera from the Taos County Adult Detention Center to the Santa Fe County Adult Correctional Facility.

82. During the transport, Miera informed me that she had told Goodrum, Jr. to take all of the money, not just half. Miera also stated that she did not believe that Montoya had any of the money.

83. Miera also stated that she had travelled to Espanola the day before the robbery to pick up Montoya.

84. When asked about Macias and Martinez, Miera stated that she had said they were involved to protect Montoya.

85. Based on the above, your affiant believes probable cause exists that Jennifer Marissa Miera and Troy Montoya, did, by force and violence, or by intimidation, take money from the People's Bank, 121 E. Main Street, Red River, New Mexico, on October 6, 2016, in violation of 18 U.S.C. Section 2113.

86. Based on the above, your affiant believes probable cause exists that Jennifer Marissa Miera and Troy Montoya, did conspire to, by force and violence, or by intimidation, take money from the People's Bank, 121 E. Main Street, Red River, New Mexico, on October 6, 2016, in violation of 18 U.S.C. Section 371.

87. Based on the above, your affiant believes probable cause exists that Shawn Michael Goodrum, Jr., did, having knowledge of the actual commission of a felony (bank robbery) cognizable by a court of the United States, conceal and did not make known the same to some judge or other person in civil or military authority under the United States, in violation of 18 U.S.C. Section 4.

I swear that this information is true and correct to the best of my knowledge and belief.

Respectfully submitted,

_____
Russell S. Romero
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me this 12th day of October, 2016.

_____
Honorable Steven C. Yarbrough
United States Magistrate Judge

Re US v. Miera, Montoya, and Goodrum, Jr.

14